and the first is number 15-3427 Haskell versus Superintendent Greene SCI Ms. Long and Mr. Richmond. Good morning may it please the court my name is Elisa Long I'm here with Erin Butler from the Federal Public Defender's Office in the Western District of Pennsylvania and we represent Vance Haskell. I'd ask for Imposing the Brecht harmless error test allows prosecutors considerable discretion in determining prior to and during trial just how much false evidence the law will allow. Are you suggesting it allows false any false evidence? You're not suggesting that prosecutors are allowed to present any false evidence are you? The Brecht test allows them to present false evidence and not have a remedy the defense not have a remedy for it so the problem the Brecht test is that it sets the bar very very low for prosecutors and prosecutors well know as we all know that oftentimes the falsity is not exposed until habeas review. So basically what you've got right now is a circuit conflict you've got the Ninth Circuit favoring you and you get the first six the tenth and the eleventh going the other way and at one point a decision of our court went the other way but it was since vacated by the Supreme Court. That's correct your to the Ninth Circuit the Fifth Circuit as well although not explicitly discussing Brecht it has after Brecht applied just the Giglio or the Naipu reasonable likelihood standard. When the prosecutor fails to correct false testimony and that allows then there is no relief it really turns the notion of the trial as a truth-seeking process on its head and this is the reason why the misconduct or this type of Brady error the Supreme Court considers it to be the most serious of the Brady type errors and it has set out a separate and higher materiality standard for it. We know that the Supreme Court in evaluating traditional or non-disclosure Brady claims does not apply the Brecht test they apply a reasonable probability that the result would have been different test. There's really no reason here why this court should impose the Brecht test where the prosecutorial conduct is more egregious it should not impose the materiality standards set forth in Giglio and Naipu and others that a reasonable likelihood is the correct standard here. The Brecht test really we don't again like we don't use these for the other two categories of Brady errors and because this is a more serious error it should not be used here where we have a what I would say is a presented a where the prosecution here presented a pattern of false uncorrected testimony and this began at the preliminary hearing stage and extended all the way through closing arguments at the trial. Let's assume for the moment that we accept your argument and you void the additional Brecht layer. How does Mr. Haskell make the lower reasonable likelihood showing? There were only three that the central issue here at the trial was the identity of the shooter there's no question that there was a shooting there's no question that to one person was killed and one person was injured. The real issue was in a bar crowded bar at night with 150 people or so who the person was who fired the shots. Almost every piece of evidence that was presented was problematic in some way and the prosecution acknowledged that. The credibility of some of these witnesses was questionable. Many of the prosecution witnesses were later impeached by testimony of defense witnesses. Some of the prosecution's witnesses was inconsistent with others. What about Mr. Mathis's videotape statement? Mr. Mathis told a number of different versions of events. The videotape statement if believed still doesn't make Mr. Haskell the shooter. He says he was and then the videotape statement Mr. Mathis says he was at the bar he saw Mr. Haskell he was not near Mr. Haskell when the shots were fired but then after the shots were fired and people were leaving the bar he saw Mr. Haskell with the gun and he went with him out the door. But I would say that Mathis's instruction instructing the jury to look with great you know skepticism at his testimony but it was also countered by his testimony at trial and again many of the things that he said in the videotape statement were inconsistent with what witnesses testified to a trial. What about Roberts? Dorothea Roberts? Yes. Her testimony is problematic in that she had a pending charge. She accuses Detective Skindle of lying when he testifies that she did not she told him she could not identify the shooter and she could not pick him out in the lineup and then later at trial after she's in jail on another chart is able to then identify the person in court as Mr. Mathis. I would ask the court to consider any in-court identification as Mr. Mathis with skepticism as well. I'm the only African-American man in the courtroom and it's very easy for these witnesses to point to him and say yes that looks like or that is the shooter. I would say to Antoinette Blue was the only witness who was really untainted at least by the jury by either her criminal record or potential favors from the prosecution. There was no instruction about how she could have curry favor or how her testimony might be biased because she's getting a benefit like there was for Ms. Roberts. So the prosecution was able to present her as somebody unbiased and untainted who really had a story where she met Mr. Haskell before the night of the shooting, saw him the night of the shooting and then identified him as the shooter and she's really the only witness who's able to do that and I think one of the things to look at is why would the prosecution... Mathis said that he was with him when they took off. He didn't see him shooting but he also saw him disposed of the gun. Correct. He did testify to that. He then recanted that testimony at the trial and I would say about the gun I mean there was a gun found in the area three or four years after the shooting. It could have been the gun but there was no definitive link between the gun that was found in the area three or four years later and the guns that were used in the shooting itself. The ballistics say it was the same type of bullet. I believe it was a nine millimeter bullet that could have been fired from that gun that those types of bullets were recovered at the scene but there was no link definitive link between the gun and the shooting but even if there has been... Is the testimony of Dashaun Beard and Pam Barnes undermining the credibility of Mr. Mathis? I mean I think so because if I'm remembering their testimony correctly they testified that Mr. Mathis and someone else, somebody they identified as Mr. Haskell, came back to their apartment after the shooting. Neither of them were at the at the shooting. Mr. Mathis does not have him going to that apartment in his statement. He does not. In his recanted statement. His statement I think is that he never saw Mr. Haskell after the shooting or that they in the videotape statement he says they took a cab. In his recanted statement he says he drove himself to the bar. So I do think that and the memories of some of these folks because it's four years have passed the motivations for coming forward kind of late in the game suggests that the court can't have confidence without Antoinette being affected or was not affected by her testimony. I would also point out that everything that Ms. Beard, that Ms. Blue testified to that was not true inured in some way to the prosecution's favor. Every single lie really minimized her potential criminal exposure, her past criminal history and also any potential benefit she was receiving from the government. So it wasn't the lie that was could have gone either way. These were lies that really every single time inured to the prosecution's benefit. Why doesn't it make sense in the habeas context that we take a two-step approach and first say was there a constitutional error or an error of constitutional magnitude and look at it materiality from that perspective and then say okay there's an error here. Now let's apply the harmless error of Brecht standard. Because in determining whether there's an error. In the habeas context. Because the Supreme Court has set a different standard for this type of error because it does undermine the truth. In the habeas context the Supreme Court has said so? Well in Kyle's they have set forth for other Brady type errors and Brady type errors that are less serious they have set forth that standard and they have not applied Brecht and explicitly decided not to apply Brecht in Brady and the Supreme Court recently in Weary v. Hayne analyzed a Brady claim and again in the habeas context did not impose a harmless error test on top of the Brady materiality. Does Augers also help you? Augers does help yes because it does set forth the three different categories of Brady claims and does say that this is the most serious and that's why the Supreme Court imposed the highest burden on the prosecution to overcome for this type of error because it really does get to the fundamental fairness of the trial itself. If we did apply the Brecht test that is whether there's a grave doubt about whether the error had substantial injurious effect or influence on the jury. Could you still win? I think so. I do think here like I said the evidence is problematic. Almost every piece of evidence is problematic in some respect. If you take the evidence in its totality, the recantations, the favors, the misidentifications, the really kind of botched photo array procedure that was used here, I do think I could still win and I also think there is an exception in Brecht where there has been a pattern of prosecutorial misconduct. The court does not need to apply a standard as high for the defense as the Brecht standard is. So I do believe we also fall within that exception as well but I do think we could show that this is, this meets the Brecht standard. What are you asking us to do? I'm asking you to reverse, to vacate the opinion of the district court and order that Mr. Haskell get a new trial. We'll hear from Mr. Richmond and we'll get you back to the court. Thank you. Good morning. May it please the court, my name is Mark Richmond, I am an assistant district attorney in Erie County and I am representing the appellee in this case, the superintendent of SCI Green. May I ask you a question with respect to Mr. Hayes, when did he know that Ms. Blue was with respect to Erie and Mercer County not telling the truth? Well he was aware of her Mercer County charges, there was contact with Mercer County as the court is aware prior to the trial so he was aware of what was going on there at that point. He testified he probably would have been aware that he had the knowledge of what was going on with Mercer County at that point. You wrote a letter April 30th of 98 right? Yes sir. So he clearly knew then? Yes sir. Clearly knew at trial? Yes sir. He clearly did not correct her testimony at trial, correct? That's correct. Not only that, he vouched for her in his closing argument. Didn't he? He says words to the effect, if you believe her, that's your man. He said that right? Yes and he also said that she's not a liar at least not about what happened here. So I think that he was couching that in terms of the overall totality of the evidence that was presented when he made his closing argument to the jury. He said believe her because of everything else that we have here. He said that of course it's not a lie, she's not a liar at least not about what happened here. That means I'm telling you the jury that she's telling the truth and that's the classic vouching is it not? Well I think he's vouching for her but I think again it's in the context of the entire trial. And part of that context is he knew she had perjured herself and didn't correct it, right? I mean that's part of the context of the trial. Well she does, sir, did she perjure herself, yes or no? I'm not sure what the answer to that is Sean. Let me, if I could explain it this way. She was asked by Attorney Hayes whether or not she was going to get any consideration for her testimony. When he asked that question, she seemed to be confused by the question to some degree. So he re-asked it. The question was do you anticipate receiving any consideration for it? Do I what? Question, do you expect to get something out of testifying? No, sir. That's correct. I think you have to look at it in the perspective of Antoinette Blue in this situation. What was she getting in terms of Mercer County in exchange for her cooperation? She wasn't getting any charges dropped. She wasn't getting a specific recommendation of a sentence that she was going to receive in return for her cooperation. The most that was going to happen is that it was going to be made known to the Mercer County judge that she had cooperated, nothing more. So from her perspective, she was not getting something tangible. Now this is not an attorney. This is not somebody who studies in libraries all day long. This is as Mr. Hayes stated in his opening statement. These are people that live by street rules. Right, but Mr. Hayes didn't live by street rules. Isn't that incumbent on him to correct the record? Well, as far as the prior record that she had, that was something that was given to the defense counsel in terms of discovery. I'm talking about the suggestion. Should he have it out there? Yes, sir. The question he asked, did you expect to get something out of it? And she goes, no, sir. And if he knew at that point that there were negotiations going on or discussions going on with Mercer County, she is hopeful of getting something. And he knew it. Well, he wrote a letter later on when he wrote a letter in December in which he indicated that she was aware that there was not going to be any change or alteration in the Mercer County charges as a result of her testimony. Again, that's a letter that was written after the fact, but that would be consistent with what her understanding was. But when you have a key witness, and clearly this person was a key witness, and the person gives what appears to be perjured testimony, why should that not be considered the same type of violation that you have, as Whitney does, with Brady material? Well, I mean, I guess I would use the Brady analysis, Your Honor, in that it wasn't material under the circumstances. I think because her credibility was already subject to attack by defense counsel with her prior testimony at the preliminary hearing, with her prior record. It's not like they were trying to paint Ms. Antoinette Blue out to be some sort of an angel in this situation. How can you tell this is not material under the circumstances when in his closing argument he has a very specific reference to her and her testimony, and it says, if you believe her, he's your man? How can you suggest it's not material? I think he's – excuse me, Your Honor, I'm sorry. You have to look at the totality of the circumstances as presented by – I am, I am. And he makes that argument, his closing argument, vouching for the testimony of a perjured – a woman who's perjured herself when he knew she perjured herself. Well, what I'm arguing, Your Honor, is that it's not material in light of the fact that she was – her credibility had already been attacked during the course of the trial. Attorney Moore, who was the defense counsel in this case, had questioned her credibility, questioned her motive for coming forward, challenged her credibility in his closing arguments to the jury in this situation so that it was nothing – it's not as if she was coming into the court unsullied with a perfect reputation or she was made out to be a member of the Chamber of Commerce or anything along those lines. She had baggage, and that baggage came out in trial. This would have only added – it would have given another basis for – that when she answered that she wasn't getting any kind of quid pro quo with regard to her testimony, she said no. And the concern that you have with Mr. Hayes is if he knew there was something up, why in the world was he asking that question? It was not – I mean, I just would guess – I would say it's not a leading question in this situation. I would argue he was not eliciting that particular response. She had the opportunity to have responded as she responded. Now, should he have corrected the record? Yes, he should have. There's no question about that. And then add on to that the point that Judge Estrepo makes. He should not, at closing, even have referred to it. Not only did he refer to it, but he said, in effect, she is not a liar. She, in effect, is telling the truth. And again, I think – sorry, Your Honor. Again, it's because of the other witnesses that we have there. As the court has already referenced previously, you had the videotaped statement of Mr. Mathis, which implicates the defendant. You have Ms. Roberts, who implicates the defendant. You have Ms. Wayne, who implicates the defendant. But they all have significant baggage as well. And the one person who said that she was present right there, saw it happen, and purportedly, as far as the jury is concerned, that there's no problem with her. And yet there is. We know that there is. So it really segues into what kind of test we should have here. If you do what Judge Chertoff wrote in Lambert, is there a reasonable likelihood that testimony could have affected the judgment of the jury? Then you've got a major problem. What you've got to argue for is that somehow there is added on to that the Brecht test as to whether a judge has grave doubt that whether there was actually any injurious effect on the jury. So it sort of puts the burden on the other side. But we know that for Brady claims, that's not necessarily the case. And the question is for perjure testimony, arguably perjure testimony that the prosecutor knew about and vouched about. Why isn't that every bit as troublesome as was the Brady suppression in Kyle's v. Whitney? I think it is troublesome, Judge. I agree with you. I'm not trying to vouch for Mr. Hayes' conduct in this situation. I'm not trying to condone what he did in this situation. But I'm just saying that based on the totality of the evidence that's presented, I don't believe that it's material. I believe the harmless error standard should be applicable to this case. And, well, I'm lost. Why so? Why should the harmless error standard? I think it's applicable to this type of a case, Judge, because Hayes' proceedings are to deal with grievously wrong situations that I don't believe that Mr. Haskell, in this situation, was grievously wrong by the conduct which took place in this case. So you're saying the conduct, albeit bad, was not really bad? I think, again, in light of all the other evidence, again, it was wrong. He should have corrected it. But I don't think that in the overall context of the case, that I don't think it's a type of error, a grievous wrong, the structure of the trial that occurred here that would warrant habeas corpus relief for Mr. Haskell. And I hate to keep coming back to this, but I can't get beyond this closing argument where he made specific reference to this woman and said, if you believe her, he's your guy, kind of like full stop. So that doesn't do it for you? Doesn't do. You still think it's harmless error? Yes, sir. If that doesn't apply, is Mr. Haskell entitled to relief? I don't think there would have been a reasonable likelihood that the verdict would have been affected. It could have been affected. Excuse me. It could have been affected. Sorry. All right. Any further questions? No. All right. Thank you very much. Thank you. Thank you. I think there's no question here that Antoinette Blue perjured herself and that the prosecution knew she perjured herself, not just about her pending charges in Erie County and her pending probation and parole violations in Erie County, but also her pending charges in Mercer County. She also perjured herself about her past charges, and she also perjured herself about the consideration that had been discussed and at the time of her trial testimony had already been delivered by Detective Skindle to her attorney in Mercer County so that she could get a better plea deal in Mercer County. It doesn't matter that the defense attempted to challenge Ms. Blue's testimony because he had no wind in his sails. Because Ms. Blue lied, he wasn't able to effectively impeach her credibility. This allowed the Commonwealth to vouch for her, as Judge Restrepo said, and really there would be no reason to vouch for her unless it was really critically important that the jury believe her testimony. Is it your position that the other courts of appeals, besides the Ninth Circuit, have got this wrong? Yes, Your Honor. And I believe that what the other courts of appeals have done is inconsistent with what the court said in Kyle's and what the court said in Giglio and Napu, that this is a very serious error that undermines the fundamental fairness of the entire trial. Did you make an argument that the conduct in this case is even more egregious than the conduct in the Ninth Circuit? I believe so. I'm trying to remember the facts in the Ninth Circuit. The witness was not told of the deal, so therefore he couldn't in essence perjure himself. Correct. So here, there are some cases that say the knowledge of the witness is immaterial, but what's really important is the knowledge of the prosecution. But here we have both. So yes, I do believe it is actually more egregious. Just one other thing about the closing. It wasn't just that the prosecutor vouched for Ms. Blue at closing. He also mocked or ridiculed defense counsel's efforts to try to undermine her credibility, and the only reason defense counsel was unsuccessful was because Ms. Blue continued to lie and the prosecutor didn't correct it. One other thing I'd just say. If the court is not comfortable remanding or vacating on the record, we have one other option would be to remand for an evidentiary hearing to explore some of these issues of when the prosecutor knew and when Ms. Blue knew. But I do believe on the record you have that it is clear that the prosecution knew and Ms. Blue knew that the lies were told and that the lies were elicited. Thank you very much. Thank you to both counsel for well-presented arguments, and we'll take the matter under review.